UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SIVORIS SUTTON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-1240** |
| **BURL CAIN, WARDEN** | **SECTION "B"(6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. For the following reasons, it is hereby recommended that the instant petition be **DISMISSED WITH PREJUDICE** as untimely.

## I. PROCEDURAL HISTORY

On February 6, 1993, petitioner, Sivoris Sutton, a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana, along with co-defendant, Charlie Water,

was convicted of two counts of second degree murder, in violation of LSA-R.S. 14:30.1.[1] On March 4, 1993, both Sutton and Water were sentenced to concurrently-running terms of life imprisonment, without benefit of parole, probation or suspension of sentence.[2] Sutton and Water jointly appealed their convictions and sentences and the Louisiana Fourth Circuit Court of Appeal, on January 31, 1996, affirmed both Sutton and Water's convictions and sentences. *State v. Sutton and Water*, 666 So.2d 737 (Table), No. 93-KA-1512 (La. App. 4 Cir. 1996) (unpublished opinion).[3] Thereafter, Sutton did not apply for rehearing nor did he seek review with the Louisiana Supreme Court.[4] Thus, under the provisions of La.C.Cr.P. art. 922, Sutton's conviction and sentence became final 14 days later, on February 14, 1996, when the delay for applying for rehearing expired.[5]

---

[1] State rec., vol. 1 of 9, docket master entry dated 2/06/1993.

[2] State rec., vol 1 of 9, docket master entry dated 3/04/1993.

[3] A copy of the Louisiana Fourth Circuit's unpublished opinion on direct appeal is contained in the State rec., vol. 1 supplemental.

[4] In his second supplemental brief (rec. doc. 15, p. 1), Sutton submits that he jointly filed with Water a timely pro se writ application to the Louisiana Supreme Court seeking relief in connection with the state appellate court's adverse January 31, 1996 decision. Sutton's assertion in this regard is incorrect. As this court noted in its February 1, 2011 Order (rec. doc. 13, pp. 2-3), a review of the Louisiana Supreme Court's opinion in connection with the pertinent writ application, *State v. Water*, 674 So.2d 980 (La. 1996), reflects that it only pertains to the "writ of certiorari and/or review" filed by Charlie Water. This conclusion is further supported by the fact that Sutton, on February 9, 1999, filed with the Louisiana Supreme Court a "Motion for Permission to File Out of Time Petition for Writ of Certiorari". *See* discussion *infra* at p. 3.

[5] La.C.Cr.P. art. 922 provides, in pertinent part, as follows:
    A. Within fourteen days of rendition of the judgment of the supreme court or any appellate court, ... a party may apply to the appropriate court for a

On February 9, 1999, counsel for Sutton filed a "Motion for Permission to File Out of Time Petition for Writ of Certiorari" with the Louisiana Supreme Court.[6] On June 4, 1999, the Louisiana Supreme Court denied Sutton's motion to file an out-of-time petition for writ of certiorari. *State v. Sutton*, 743 So.2d 1243 (La. 1999).[7]

On February 9, 1999, the same date on which counsel filed on Sutton's behalf a motion with the Louisiana Supreme Court seeking to file an out-of-time writ of certiorari, counsel filed an application for post-conviction relief with the state district court.[8] Sutton's

---

rehearing....
      B. A judgment rendered by the supreme court or other appellate court becomes final when the delay for applying for a rehearing has expired and no application therefor has been made.

[6] A copy of Sutton's motion seeking to file an out of time writ with the Louisiana Supreme Court is contained in State rec., vol. 1 supplemental.

[7] In his second supplemental brief (rec. doc. 15, p. 2), Sutton suggests that he is entitled to credit, in terms of when his statute of limitations should commence to run, by virtue of his motion to file an out-of-time writ of certiorari. In support of his position, Sutton cites *Jimenez v. Quarterman*, 555 U.S. 113, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009). Sutton's reliance on *Jimenez*, however, is misplaced. The Supreme Court in *Jimenez*, 129 S.Ct. at 686, determined that a state court's grant of a right to file an out-of-time appeal resets the date when a conviction becomes "final" under the AEDPA and, as such, effectively restarts the running of a petitioner's statute of limitations. However, in the instant matter, Sutton did not file a motion seeking an out-of-time appeal, but rather, filed a motion seeking an out-of-time writ of certiorari. Further, in Sutton's case, his motion for an out-of-time writ of certiorari was denied, not granted. Accordingly, Sutton is not entitled to a re-start of his prescriptive period by virtue of his failed motion for an out-of-time writ of certiorari.

[8] A copy of Sutton's application for post-conviction relief is contained in the State rec., vol. 2 of 9.

effort in this regard culminated on February 26, 2010, when the Louisiana Supreme Court denied his writ applications. *State ex rel. Sutton v. State*, 28 So.3d 264 (La. 2010), and *State v. Sutton*, 28 So. 3d 264 (La. 2010).

On April 6, 2010, Sutton filed the instant pro se habeas corpus action, raising the following claims: 1) State courts erred in holding that his claims were time barred; 2) state courts erred in holding that his claims were repetitious; 3) state courts erred in holding that he failed to carry his burden of proof; and, 4) state courts erred in denying him relief.[9] Based upon the reasoning set forth below, the court finds Sutton's federal habeas corpus application to be untimely.

## II. ANALYSIS

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner has one year within which to bring his habeas corpus claims pursuant to 28 U.S.C. § 2254, with this one year period commencing to run from "the latest of" either the date the

---

[9]This April 6, 2010 filing date was ascertained via the court's use of the "mailbox rule." Under this rule, a pleading filed by a prisoner acting *pro se* is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing. *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). Generally, the date a prisoner signs his petition is presumed to be the date he delivered it to prison officials for mailing and, therefore, the filing date. *Colarte v. Leblanc*, 40 F.Supp.2d 816, 817 (E.D. La. 1999) (assumed that petitioner turned his habeas corpus application over to prison officials for delivery to this Court on the date he signed his application). Since the filing of the instant petition, counsel has enrolled on behalf of Mr. Sutton. *See* rec. doc. 11.

petitioner's state judgment became final or the expiration of his time for seeking review.[10] *See* 28 U.S.C. § 2244(d)(1) (West 2010), as amended by the AEDPA, P.L. 104-132, 110 Stat. 1220. However, in situations such as this, where a petitioner's conviction and sentence, along with his corresponding expiration of time for seeking review, pre-date the April 24, 1996 AEDPA effective date, a one-year grace period, from April 24, 1996 until April 24, 1997, must be allowed during which a petitioner could timely file a federal post-conviction habeas challenge. *Flanagan v. Johnson*, 154 F.3d 196, 201-02 (5th Cir. 1998). Accordingly, Sutton had until April 24, 1997, to timely seek federal habeas corpus relief.

Sutton did not file the instant action until April 6, 2010, almost thirteen years after his limitation period expired. Thus, Sutton's federal habeas corpus application must be dismissed as untimely, unless the one-year statute of limitations period was interrupted as set forth in 28 U.S.C. § 2244(d)(2). Under that statutory provision, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

In the instant matter, Sutton filed no post-conviction or other collateral review proceeding which would have tolled his one-year prescriptive period running from April 24,

---

[10] The AEDPA applies to this case as it was filed after the enactment of the AEDPA, or after April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2060, 138 L.Ed.2d 481 (1997).

1996 to April 24, 1997. Thus, this matter would appear to be time-barred absent a basis for equitably tolling Sutton's prescriptive period.

Equitable tolling is justified only in "'rare and exceptional circumstances.'" *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999), *cert. denied*, 531 U.S. 1164, 121 S.Ct. 1124, 148 L.Ed.2d 991, *quoting Davis v. Johnson*, 158 F.3d 806 (5th Cir 1998), *cert. denied*, 526 U.S. 1074, 119 S.Ct. 1474, 143 L.Ed.2d 558 (1999). It "applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999), *cert. denied*, 529 U.S. 1057, 120 S.Ct. 1564, 146 L.Ed.2d 467 (2000), *citing Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996). The evidence must show that the applicant, though deterred by matters outside his or her control, was nevertheless diligent in his or her pursuit of § 2254 relief. *Coleman*, 184 F.3d at 403.

In his supplemental and reply brief (rec. doc. 12, pp. 4-7), Sutton contends that he is entitled to equitable tolling of his one-year statute of limitations based upon his "actual innocence." In support of his contention, Sutton cites *In re Davis,* __ U.S. __, 130 S.Ct. 1, 174 L.Ed.2d 614 (2009). However, *Davis*, a death penalty case, involved a situation wherein the petitioner was seeking to be excused, based upon a claim of actual innocence, from the prohibition against filing a successive habeas petition. Davis, unlike Sutton, was not seeking, based upon a claim of actual innocence, to be relieved from the prohibition against filing a

habeas petition outside the one-year statute of limitations.

Whether a habeas petitioner, based upon a claim of actual innocence, is entitled to equitable tolling of the one-year statute of limitations appears to be an open question in the Fifth Circuit. *See Prince v. Thaler*, 354 Fed.Appx. 846, 847, 2009 WL 3806077, *1 (5th Cir. 2009) ( "There is no precedent in this circuit whether actual innocence may equitably toll the statute of limitations.").[11] However, because Sutton has not made a showing of actual innocence, the court need not address this issue.

To make a showing of actual innocence a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of newly discovered evidence. *Prince*, 354 Fed. Appx. at 847 (citing *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995)). In order to evaluate the "newly discovered" evidence submitted by Sutton, an examination of the facts, as set forth in the Louisiana Fourth Circuit's unpublished opinion, *State v. Sutton*, No. 93-KA-1512, is appropriate.

## A. FACTS

The neighbor who lived next door to 7222 Culpepper Street heard a woman screaming for her life from that apartment. He never heard gunshots, but soon the screaming stopped. He was a reserve deputy and called in the report. Officer Danny Riley answered the call

---

[11]*But see United States v. Riggs*, 314 F.3d 796, 800 n.9 (5th Cir. 2000) (quoting *Cousin v. Lensing*, 310 F.3d 843, 849)) ("a petitioner's claims of actual innocence are [not] relevant to the timeliness of his petition").

along with other Seventh District officers. He saw a body lying on the floor. The front door was unlocked, and the officers entered. There was no signs of forced entry. A black male, Henry Hodges, lay on the living room floor, four feet from the front door, deceased. A black female, Charleen Collins, was in the kitchen, bleeding from her head, still breathing. Collins later died. No weapons were found in the possession of either victim. Riley found a patio door partially open, and a green ski mask laying nearby. A tenant approached Riley, and told him he had seen a black male kneeling near a dumpster when he had parked his car earlier. Riley broadcast a description of a black male wearing dark clothes, possibly with a dark cap, who had last been seen running down Morrison Road toward a Burger King. A security officer at nearby Roje's restaurant reported back that he had seen a man matching that description walking in the area. Riley broadcast the information. Riley then learned that Third District officers had stopped two men at the intersection of Laine and Dwyer. He went to that location. He released one of the two men, but saw that the other had blood on the back of his head. He took him back to the scene of the crime. No one could identify him.

      Officer Bobby Graham testified he heard the broadcast, saw the two men walking in the area, saw that one of the men fit the broadcast description, and stopped both men. He advised them that they were under suspicion for having committed a murder in the area a few minutes earlier. One identified himself as Gerald Cowart. The other, Charlie Water, had no identification. Graham searched the men on the scene, and recovered a black "dew rag", a

set of keys, and a flashlight on Water. Cowart was released. Water was transported back to th the scene, and the keys were found to fit the apartment where the crimes occurred. Water was then placed under arrest. A further search of Water revealed spent casings and a letter from the Georgia Department of Corrections with Water's name on it. Graham could not identify Water at trial.

Dr. McGarry, a forensic pathologist, conducted the autopsy of Hodges, and said that he suffered three gunshot wounds to the head. He also said that the victim had traces of cocaine in his system.

Dr. Newman, a forensic pathologist, who conducted the autopsy on Collins, said she suffered five gunshot wounds to the head. The toxicology report was negative.

Detective Marco Demma testified he arrived at the scene, secured it, and the Crime Lab photographed the scene. He found live .22 cartridges on the scene, one on the floormat outside the front door, and spent .22 casings. He also recovered one live Federal round, spend Federal casings, and a flashlight. In the photographs, he identified where the ski mask was found. He said that when Water was returned to the scene, he was wearing black pants, a black shirt, and black shoes. The flashlight seized from Water matched the flashlight found at the scene. Car alarms found on Water operated the cars belonging to the two victims. A key found on Water operated the front door of the apartment. When he discovered this, he placed Water under arrest. A further search of Water revealed a spent .22 casing which

matched those on the scene. He learned Water's name from a Georgia Department of Safety letter in Water's possession. However, Water continued to identify himself as Johnny Jones. Demma read Water his rights, and Water told him that he was on vacation to attend a karate tournament, and that he was staying with his parents at a Holiday Inn on Chef Menteur Highway. Demma sent Detectives Louis Suarez and James Stewart to the motel. Later, he went to the hotel where Suarez and Stewart were in one of the rooms with Sivoris Sutton, Cowart, Max Steele and Vivian Curtis. Also in the room were a loaded .22 and a loaded .45 caliber semi-automatic handgun that had been in a bag that Curtis said belonged to Sutton. Demma said, however, that the .22 could not have fired the bullets which were found at the scene. In Curtis's purse was $2,700.00. Demma took Cowart to another room where he made a statement which caused Demma to arrest Sutton. He also arrested Cowart. Once at the homicide office, Demma again spoke to Cowart and decided to arrest Steele and Curtis. By the time the officers returned to the hotel, however, Steele and Curtis had left. Curtis was subsequently arrested in Georgia. When she was arrested, Curtis was found to be in possession of a .380 Llama semi-automatic handgun, and in excess of $7,000.00. Steele has never been arrested. Demma also learned that a car rented by Sutton's girlfriend's mother had been towed from the parking lot of the apartment complex where the murders occurred to the Holiday Inn several hours after the murders. Cowart's fingerprints were on the car. Two days after the crimes, a .22 Reugger, semi-automatic handgun with a silencer was discovered near

the apartment complex. Near the gun were a pair of gloves, a shoulder strap and holster. A month after the crimes, Curtis was returned to Louisiana and Demma interviewed her. A search of her storage shed in Georgia revealed more ammunition and gun paraphernalia Curtis said belonged to Steele. Also in the shed were two pairs of gloves that matched the gloves found near the scene of the crime. Her phone records revealed a call to Cowart near New Orleans. Once she was in New Orleans, she told Demma that she had lied to him when she told him that she did not know anything about the crimes. She said that she did not know anything about the murders but that she knew that she, Steele, Sutton and Water were coming to New Orleans to "rip somebody off." She then asked for a lawyer and never made another statement.

Curtis testified that Steele was her boyfriend. She came to New Orleans with him, Sutton and Water. The men intended to rip off a drug dealer. She knew that Steele had done so once before. She was coming to New Orleans to vacation. She said that they had come to New Orleans on other occasions, and that when they did they would meet up with Cowart. On the occasion that led to the crime, they came to New Orleans in a car rented by Sutton's girlfriend's mother. She drove while the men slept. She rented two rooms at the Holiday Inn but she did not register under her name because the men told her not to.

Early the next morning, Cowart met them at the motel bar. The men left to go find where their intended victim lived. They returned and began making plans for how they would

execute the crime. She left to get gas. When she returned, Steele began to suggest that they not go through with the crime. Sutton insisted that they do. They began to worry that the victim would not open the door to a stranger. They tried to convince Curtis to go to the door since the victim would probably open the door for a woman. She refused. Cowart decided he would go to the door because the victim knew him. Cowart, Sutton and Water left. Sutton and Water were wearing dark clothes. She did not know whether the men had guns or whether there were guns in the car.

Sutton returned to the room at 10:30 p.m. breathing hard. He told her there had been a shooting, and that he had to run back to the motel. Curtis did not know who had been shot, but Sutton said that the job was finished. Curtis asked whether they had gotten any money, and Sutton told her that they had not had time. She went downstairs because she was concerned about where the car was. Half an hour later, she saw Cowart get out of a small dark car. He told her that their car was outside some apartments and that Water had the key, but that he had been picked up by the police. Curtis assumed that Water had been detained by the police because he did not have identification on him. She called locksmiths but to no avail. Cowart then announced that he knew a tow truck service, and he called it. Curtis pressed the men to return home because she was scared, but Sutton said he would not return without Water. Sutton and Cowart then left to get the car. The police arrived, and questioned her. She did not tell them that they had come to New Orleans to rob a drug dealer because she

was scared. While they were questioning her, Cowart and Sutton returned. The police went through all the bags. She explained that she was carrying cash because she did not have a savings account, and because the place where she and Steele were living had been broken into. The police arrested Cowart and Sutton. She and Steele caught a bus back to Georgia. Steele told her that he did not know what had occurred and that he doubted that they would ever know. She went back to work the next day. Two or three days later, Steele disappeared. She called NOPD to inquire into getting her money back. She did not realize she was wanted for a crime. One day, Georgia officials came to her job and arrested her.

Detective Stewart testified that Curtis consented to a search of the room and the bags, and that she said that she had no knowledge of a murder. He also searched the other room in the motel but it was empty.

Water testified he came to New Orleans to attend a kick boxing event. Steele was his kick boxing instructor. After they arrived at the hotel, Steele told him that the event had been cancelled, so he and Sutton moved all of their belongings to the room where Curtis and Steele were staying to prepare to leave. Then he went downstairs and called a woman that he had met in the lobby. He met an employee of the motel who drove him to the woman's house. He left her house to buy cigarettes. On the way back, he saw a man that he did not know being frisked by the police. The police stopped and searched him. He did not tell them his real name because he knew he was wanted in Georgia. They took a flashlight from him that

13

he had taken from Steele's room. He did not know how the keys or the bullet shell got into his pocket. He told the officers that he was staying at the Holiday Inn, but he denied he told them that he was staying there with his parents. He denied being involved in the murders, said he did not know anything about the guns, and said that he did not know Cowart. He said that he supposed it was a coincidence that Cowart's fingerprint was on the car that Sutton had rented. He did not know how he had cut his head.

### B. Newly Discovered Evidence

In support of his actual innocence claim, Sutton first points to a "recently uncovered" "Report of the Crime Laboratory" dated February 2, 1993. (Rec. doc. 15-2, p. 2). As Sutton notes, the report reflects that "blood evidence was found on the ski mask located at the scene of the crime." (Rec. doc. 15, second supplemental brief, p. 4). Sutton submits that "[p]resumably the blood evidence on the ski mask would identify the shooter in this matter and may explain the injury to the head of Mr. Water." (Rec. doc. 15, p. 4.). However, a review of the report reflects that "an attempt to type" the blood on the ski mask "was inconclusive." Thus, contrary to Sutton's assertion, this "newly discovered evidence" does not provide support for his actual innocence claim.

Next, Sutton points to a November, 1991 handwritten letter from Vivian Curtis to Max Steele "discussing emergency plans to flee the State of Georgia." (Rec. doc. 15, p. 5).[12]

---

[12]The handwritten letter is part of rec. doc. 15-2, p. 3.

Sutton submits that this "handwritten letter suggesting an on-going relationship with Max Steele combined with their mutual desire to flee ... would be significant to Mr. Sutton's case." (Rec. doc. 15, p. 5). This letter, however, does nothing more than implicate the complicity of Curtis and Steele in the crime at issue. It provides no evidence of Sutton's actual innocence.

Sutton next refers the court to "newly discovered evidence" casting aspersions on the character of Vivian Curtis, the prosecution's "star witness". Sutton points to an investigative summary detailing interviews conducted with Ms. Curtis's co-workers and ex-husband. (*See* Rec. doc. 15-2, pp. 10-13). In these interviews, Curtis's co-workers, along with her ex-husband, make disparaging remarks about Curtis and her ex-husband opines that he was not surprised that Curtis was wanted on a homicide charge. Sutton also points to pleadings (rec. doc. 15-2, pp. 14-17) reflecting that Curtis pled guilty to the amended charge of accessory after the fact and received a sentence of thirty months. Sutton charges that this evidence is damaging because Curtis stated at trial that she "was not offered a plea deal." (Rec. doc. 15, p. 5). Finally, Sutton refers the court to more interviews provided by Vivian Curtis in which she provides conflicting stories and complains that Curtis was not cross-examined regarding these earlier interviews because defense counsel was not aware of the interviews. (Rec. doc. 15, pp. 5-6).

A review of Vivian Curtis's trial testimony reflects that contrary to Sutton's assertion,

the jury was fully informed of Ms. Curtis's "plea deal" with the State.

> DIRECT EXAMINATION BY MR. BOLLMAN [prosecutor]:
>
> Q. Are you aware of what you're charged with now?
> A. Yes, sir.
> Q. What is that?
> A. First degree murder.
> Q. Are you aware of what you will receive in return for testifying or what your charge would be reduced [to] when you're through testifying?
> A. Yes, sir.
> Q. What is that?
> A. Accessory after the fact.
> Q. Do you know what your sentence will be yet?
> A. Basically.
> Q. What is that?
> A. Three to five years with time and probation included in that.

State rec., vol. 5 of 9, trial transcript, p. 355, lines 9-25.

Further review of the trial transcript reflects that the jury was also made aware of Ms. Curtis's unsavory past. In particular, defense counsel established on cross-examination that she, along with her boyfriend, Max Steele, had "ripped off" drug dealers in the past, that she had committed numerous fraudulent acts in order to obtain fake ids and that, as a result of her instability, had lost custody of her only child.[13]

Based upon the above, the court finds that the additional evidence cited by Sutton which would have cast more aspersions on the credibility of Curtis's testimony is insufficient to satisfy Sutton's burden of proof. Stated differently, the court finds that Sutton has failed

---

[13] *See* State rec., vol. 5 of 9, trial transcript, pp. 402-454.

to show, as required under *Prince*, *supra*, and *Schlup*, *supra*, that no reasonable juror, having been aware of this evidence, would have convicted him.

Sutton, in an effort to satisfy his burden of proof, next refers to a "letter to Detective Demma's supervisor [which] indicates that the State was missing lab reports, witness statements, fingerprint reports, police reports from Atlanta, and portions of the supplemental police report." (Rec. doc. 15, p. 6). However, the fact that the above-delineated items were missing, in the absence of information regarding what evidence these missing items would have provided, is clearly insufficient for the purpose of proving Sutton's actual innocence.

Finally, Sutton relies upon "[a] receipt for an in room movie ordered on the date of the homicide, November 16, [which] was withheld from defense counsel." (Rec. doc. 15, p. 6). Sutton argues that while a time is not indicated on the receipt, "there is a hotel reference number that through due diligence, may have allowed the defense to locate witnesses who took the cash payment and made the cash refund for the movie", thereby providing Sutton with an alibi, i.e., that he was purchasing a movie at the time of the murder. (Rec. doc. 15, p. 6). Once again, however, the offered evidence is simply too tenuous to satisfy the test enunciated in *Schlup*, *supra*, and applied in *Prince*, *supra*, in the context of a petitioner's assertion of actual innocence for the purpose of equitably tolling the AEDPA's one-year statute of limitations. Sutton has failed to show that no reasonable juror, aware of this evidence, would have convicted him. Accordingly;

## RECOMMENDATION

For the foregoing reasons, it is hereby recommended that the application for federal habeas corpus relief filed by petitioner, Sivoris Sutton, should be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[14]

New Orleans, Louisiana, this __17th__ day of _____March_____, 2011.

_____
LOUIS MOORE, JR.
United States Magistrate Judge

---

[14]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.